FILED
12 JAN 19 P 3:44
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GOLDFARB BRANHAM LLP
HAMILTON LINDLEY
2501 N. Harwood, Suite 1801
Dallas, TX 75201
Telephone: 214-583-2233
214-583-2234 (fax)
hlindley@goldfarbbranham.com

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
ALLAN STEYER (SBN: 100318)
GABRIEL D. ZELDIN (SBN: 273818)
One California Street, Third Floor
San Francisco, CA 94111
Telephone: 415-743-2808
415-421-2234 (fax)
asteyer@steyerlaw.com

Attorneys for Plaintiffs

PSG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW BRANSON, KATHRYN GRAFFMAN, JASON SIMONS, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

CARRIER IQ, INC., HTC CORPORATION, and HTC AMERICA, INC., SAMSUNG ELECTRONICS AMERICA, INC. SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

Defendants.

Case No. CV12 0305

CLASS ACTION COMPLAINT

1. Violation of Federal Wiretap Act as Amended by the Electronic Communications Privacy Act, 18 U.S.C. §§2510 *et seq.*

**DEMAND FOR JURY TRIAL**

Plaintiffs MATTHEW BRANSON, KATHRYN GRAFFMAN, JASON SIMONS ("Plaintiffs"), by their undersigned attorneys, on behalf of themselves and all similarly situated persons (the "Class," as defined below, ¶52), brings this action against defendants CARRIER IQ, INC. ("Carrier IQ") and HTC CORPORATION, ("HTC Corp." or "HTC") HTC AMERICA, INC., ("HTC America" or "HTC") SAMSUNG ELECTRONICS AMERICA, INC., ("SEA or "Samsung") SAMSUNG TELECOMMUNICATIONS AMERICA ("STA" or "Samsung") (collectively, "Defendants") and alleges:

**NATURE OF THE ACTION**

1. This class action complaint seeks monetary and equitable relief pursuant to the Omnibus Crime Control and Safe Streets Act of 1968, also known as the Federal Wiretap Act, 18 U.S.C. §2510 et seq. (the "Federal Wiretap Act").

2. To put the size of the case in perspective, consider that Carrier IQ preinstalled its software in over 141 Million mobile devices. This software enables Defendants to unlawfully access, intercept, and/or collect personal electronic communications and information obtained from private mobile devices, including mobile phones, handsets, and smartphones (*e.g.*, customer location, Internet web searches, content of text messages, etc.) ("Mobile Devices") belonging to Plaintiffs and members of the Class. As a result, everything and anything a Mobile Device user types could be logged and analyzed. As alleged herein, the Defendants violated the Federal Wiretap Act by covertly accessing, intercepting, collecting and/or using personal electronic communications and information belonging to customers using the Defendants' Mobile Devices.

3. Recently, a Connecticut technology officer, Trevor Eckhart ("Eckhart"), discovered, and posted on his blog, that Carrier IQ software is clandestinely logging and transmitting private and sensitive information from consumers' Mobile Devices, without the knowledge or consent of the Mobile Device users.[1]

---

[1] http://androidsecuritytest.com/ (Last visited December 2, 2011).

4. On November 30, 2011 the United States Committee on the Judiciary ("USCJ") wrote to Carrier IQ demanding responses to inquiries and concerns regarding the software's tracking capabilities and indicating that Carrier IQ's actions "may violate federal privacy laws, including the Electronic Communications Privacy Act and the Computer Fraud and Abuse Act." *Id.* In addition, members of the House and Senate have likewise sent their own letters to Carrier IQ voicing similar concerns.

5. Plaintiffs and members of the Class own or have owned HTC and Samsung Mobile Devices.

6. HTC and Samsung, manufacturers of mobile devices, upon information and belief, sell hundreds of millions of Mobile Devices worldwide on a yearly basis.

7. In connection with the ownership of HTC and Samsung Mobile Devices by Plaintiffs and the Class, the Defendants unbeknownst to Plaintiffs and the members of the Class had access to, intercepted, collected and/or used their personal electronic information and communications, including inherently private facts.

8. HTC and Samsung continue to be prohibited from wrongfully accessing, intercepting, collecting and/or using any personal electronic communications and information from Plaintiffs and members of the Class.

9. However, Defendants improperly accessed, intercepted, collected and/or used personal electronic communications and information belonging to Plaintiffs and members of the Class. Specifically, Samsung and HTC caused Carrier IQ to be preinstalled in its Mobile Devices and used it to access, intercept, collect and/or use personal electronic communications and information belonging to Plaintiffs and the Class.

10. This suit seeks equitable relief and damages on behalf of Plaintiffs and the Class.

**JURISDICTION AND VENUE**

11. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331 because this action arose under federal law, specifically, the Federal Wiretap Act as amended by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*

12. Furthermore, the Court has original jurisdiction over this matter, pursuant to 28 U.S.C. §1332(d), in that the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action of more than 100 potential Class members in which the citizenship of at least one proposed Class member is different from that of at least one defendant.

13. Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because Defendants reside, are found, have an agent, or have transacted substantial business within the Northern District of California within the meaning of 28 U.S.C. §1391(a) as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the District.

**PARTIES**

14. Plaintiff Matthew Branson is a resident of Jefferson County, Colorado. Defendants Samsung and Carrier IQ had access to Plaintiff Branson's personal electronic communications and information through his ownership of a Samsung Mobile Device. Plaintiff owned and used his Samsung Epic 4G since July 2011. Plaintiff has not consented to the use of his private/sensitive information, as alleged herein, by Defendants.

15. Plaintiff Kathryn Graffman is a resident of Arapahoe County, Colorado. Defendants HTC and Carrier IQ had access to Plaintiff Graffman's personal electronic communications and information through her ownership of an HTC Mobile Device. Plaintiff owned and used her HTC Evo Shift since March 2011. Plaintiff has not consented to the use of her private/sensitive information, as alleged herein, by Defendants.

16. Plaintiff Jason Simons is a resident of Arapahoe County, Colorado. Defendants Samsung and Carrier IQ had access to Plaintiff Simons' personal electronic communications and information through his ownership of a Samsung Mobile Device. Plaintiff owned and used his Samsung Epic 4G since November 2011. Plaintiff has not consented to the use of his private/sensitive information, as alleged herein, by Defendants.

17. Carrier IQ, a provider of mobile services intelligence solutions, is a privately-owned company headquartered in Mountain View, California with additional offices in Chicago,

Boston, London (UK) and Kuala Lumpur (Malaysia). In October 2010, VisionMobile announced Carrier IQ had joined the "100 Million Club" with its software installed on 100 million phones.[2]

18. Defendant HTC America, Inc. ("HTC" or "HTC America") is a Washington corporation, with its principal place of business in Bellevue, Washington. HTC America designs and manufactures mobile devices and sells mobile devices in this judicial district.

19. Defendant HTC Corporation ("HTC Corp." or "HTC") is a Taiwanese corporation located in Taoyuan, Taiwan. HTC Corp. has offices within the United States and sells products throughout the United States, including the state of California and this judicial district. HTC Corp. designs and manufactures mobile devices and sells mobile devices in this judicial district. It is the parent company of Defendant HTC America, Inc.

20. Defendant Samsung Electronics America, Inc. ("Samsung" or "SEA") is a wholly-owned subsidiary of Samsung Electronics Co. Ltd., a Korean corporation and an established leader in the worldwide electronics market. SEA's North American headquarters are located in Ridgefield Park, NJ and it oversees the North American subsidiaries, including Defendant Samsung Telecommunications America ("STA"). Defendant Samsung Electronics America, Inc., is a citizen of New Jersey as defined by 28 U.S.C. 1332(c), with its principal place of business in New Jersey.

21. Defendant Samsung Telecommunications America, LLC ("Samsung" or "STA"), is a citizen of Texas as defined by 28 U.S. C. 1332(c), with its principal place of business in Texas. STA, which was founded in 1996 by Samsung Electronics Corporation, is headquartered in Dallas, Texas. STA researches, develops, and markets a variety of personal and business communications products throughout North America, including Mobile Devices.

---

[2] http://markets.financialcontent.com/stocks/news/read?GUID=15163121 (Last visited December 3, 2011).

## SUBSTANTIVE ALLEGATIONS

22. At all relevant times, Plaintiffs owned and continue to own a Mobile Device manufactured by HTC or Samsung, two of the manufacturers that use the Carrier IQ software.

23. In connection with the manufacture and sale of its Mobile Devices, Defendants had access to personal electronic communications and information belonging to Plaintiff and Class members. Defendants unlawfully accessed, intercepted, collected and/or used the personal electronic communications and information belonging to Plaintiff and members of the Class in violation of those laws designed specifically to protect consumers and the general public.

**Carrier IQ**

24. At all relevant times, Carrier IQ Software which is embedded in over a 100 Million Mobile Devices was logging information such as location and detailed key strokes without notifying users or allowing them to opt out.

25. The company states that its software is deployed in over 150 million devices worldwide. Carrier IQ also states on its website that:

> Is unique in the wireless industry because we are the only company embedding diagnostic software in millions of subscribers' phones. And, we are the only ones who add the "IQ" or smarts to the data. This is actionable intelligence – information and analysis you can use to identify problems and more importantly, solve them. And, we are a proven leader with millions of handsets deployed with Carrier IQ software inside.[3]

26. Carrier IQ describes itself as the leading provider of Mobile Services Intelligence Solutions to the wireless industry. Mobile Service Intelligence is the process of analyzing data from phones to give insight into mobile service quality and user behavior.

27. Carrier IQ claims that "[a]s the only embedded analytics company to support millions of devices simultaneously," it gives wireless carriers and handset manufacturers "unprecedented insight into their customers' mobile experience."

---

[3] http://www.carrieriq.com/overview/index.htm (last visited December 3, 2011).

28. Carrier IQ describes its Mobile Service Intelligence Platform (MSIP) as the smart database at the heart of their solution. Carrier IQ's Insight application suite uses data from the MSIP to deliver true Actionable Intelligence, tailored to specific business areas. For example, "it delivers performance information to support the launch of a new phone or service and historical information to understand in detail *customer behavior and usage patterns*." Carrier IQ's claims on its website that its "Insight suite cuts through the complexity to allow [wireless carriers and manufacturers] to focus on critical business issues, create and track Key Performance Indicators (KPIs) and all in the knowledge that *the data is measured at the point the customer experienced it – in the phone*."[4] (Emphasis added).

29. Carrier IQ software has been classified by many as "rootkit" software. A rootkit is software that enables continued privileged access to a computer while actively hiding its presence from administrators by subverting standard operating system functionality or other applications.

30. Carrier IQ's rootkit has been described as "[a] piece of keystroke-sniffing software" which "has been embedded so deeply in millions of . . . Android devices that it's tough to spot and nearly impossible to remove."[5]

31. Eckhart actually created and posted an online video which demonstrates the handful of points that the Carrier IQ software records and logs and is then sent to the company who is interested in this information.[6] The available information from Eckhart's report demonstrates that Carrier IQ is capable of recording[7]:

---

4 *See* http://www.carrieriq.com/overview/mobileservice/index.htm (last visited on December 2, 2011).

5 Andy Greenberg, Phone 'Rootkit' Maker Carrier IQ May Have Violated Wiretap Law In Millions Of Cases, Forbes, November 30, 2011 http://www.forbes.com/sites/andygreenberg/2011/11/30/phone-rootkit-carrier-iq-may-have-violated-wiretap-law-in-millions-of-cases/ (last visited December 3, 2011).

6 http://www.theregister.co.uk/2011/11/30/smartphone_spying_app/ (Last visited December 4, 2011).

7 http://androidsecuritytest.com/ (Last visited December 4, 2011).

- Key in HTCDialer Pressed or Hardware Keys:
- App Opened
- Sms Received
- Screen Off/On
- Call Received
- Media Statistics
- Location Statistics

**Samsung, HTC and Android Technology**

32. SEA, STA and HTC, leading manufacturers of various electronic products, develop and market a variety of mobile wireless devices and includes the manufacture and sale of "Android" smartphones.

33. Android is an operating system for mobile devices such as smartphones and tablet computers developed by the Open Handset Alliance, a consortium of 84 hardware, software, and telecommunication companies devoted to advancing open standards for mobile devices. The Open Handset Alliance is led by Google.

34. Android has a large community of developers writing applications ("apps") that extend the functionality of the devices. There are currently approximately 400,000 apps available for Android. Apps can be downloaded from third-party sites or through online stores such as Android Market, the app store run by Google.

35. Android was listed as the best-selling smartphone platform worldwide in Q4 2010 by Canalys with over 200 million Android devices in use by November 2011.[8]

36. Android apps run in a sandbox, known as an isolated area of the operating system that does not have access to the rest of the system's resources, unless access permissions are granted by the user when the app is installed. Before installing an app, Android Market displays

---

[8]http://digitalprocure.com/index.php?option=com_content&view=article&id=2502:Canalys:-Android-overtakes-Symbian-as-world%27s-best-selling-smartphone-platform-in-Q4-2010-&catid=313&Itemid=10 (last visited on December 5, 2011).

all required permissions. For example, a game may need to enable vibration, but should not need to read messages or access the phonebook. After reviewing these permissions, Android users can decide whether to install the app.

37. Android smartphones also have the ability to report the location of Wi-Fi access points, encountered as phone users move around, to build vast databases containing the physical locations of hundreds of millions of such access points. These databases form electronic maps to locate smartphones, allowing them to run location-reporting apps (*e.g.*, Foursquare, Latitude, and Places), and to deliver location-based ads. *Id.*

38. One design issue that has been identified in Android smartphones is that average users cannot monitor how apps access and use private and sensitive data (*e.g.*, location and hardware ID numbers). Even during installation, pop-up screens do not often indicate to the user how critical services and data will be used or misused. *Id.* Third party monitoring software can often identify personal information sent from apps to remote servers. *Id.*

**Samsung and HTC's Use of the Carrier IQ Software Suite**

39. Samsung and HTC's Android smartphone devices, upon information and belief, are embedded with Carrier IQ software.

40. Samsung and HTC Android smartphone users have the Carrier IQ software embedded in their Mobile Devices and Defendants have access to their personal electronic communications, information, and other usage data.

41. Upon information and belief, Defendants used the Carrier IQ rootkit software to improperly access, intercept, collect and/or use the data containing personal electronic communications and information at the point the mobile user "experienced it" without the mobile user's knowledge or consent.

42. The interception of personal electronic communications and information by the Carrier IQ rootkit likely creates a permanent record of the data. Thereafter, Carrier IQ clients, including HTC and some wireless carriers, have direct access to the personal electronic communications and information of its Mobile Device users.

**Concerns over the Interception of Personal Electronic Communications**

43. Mobile device users have a right to not have their personal electronic communications and information, such as content of text messages, content of web searches, phone numbers dialed, URLs visited, and user geographical location accessed, intercepted, and/or collected by third parties.

44. On December 1, 2011, Senator Al Franken, Chairman of the Subcommittee on Privacy Technology and the Law, sent a letter to Carrier IQ's President and Chief Executive Larry Lenhart expressing some concerns over the rootkit's functions. Senator Franken stated:

> I am very concerned by recent reports that your company's software—pre-installed on smartphones used by millions of Americans—is logging and may be transmitting extraordinarily sensitive information from consumers' phones, including: when they turn their phones on; when they turn their phones off; the phone numbers they dial; the contents of text messages they receive; the URLs of the websites they visit; the contents of their online search queries—even when those searches are encrypted; and the location of the customer using the smartphone—even when the customer has expressly denied permission for an app that is currently running to access his or her location.
>
> It appears that this software runs automatically every time you turn your phone on. It also appears that ***an average user would have no way to know that this software is running—and that when that user finds out, he or she will have no reasonable means to remove or stop it.***

(Emphasis added).

45. The Senator further explained that he understands "the need to provide usage and diagnostic information to carriers" and that "carriers can modify Carrier IQ's software"; however, "it appears that ***Carrier IQ's software captures a broad swath of extremely sensitive information from users that would appear to have nothing to do with diagnostics***—including who they are calling, the contents of the texts they are receiving, the contents of their searches, and the websites they visit. (Emphasis added).

46. According to Senator Franken, "[t]hese actions may violate federal privacy laws, including the Electronic Communications Privacy Act and the Computer Fraud and Abuse Act. This is potentially a very serious matter."

47. Mobile device users are at the mercy of the manufacturers and software developers who have access to their personal electronic communications. Mobile users have no

ability to ascertain whether their personal electronic communications are being accessed, and worse, they have no way to stop the improper interception of such communications.

**Federal Prohibition on Wiretapping**

48. The Federal Wiretap Act provides that "any person who—(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished . . . or subject to suit." 18 U.S.C. §2511.

49. Defendants have access to personal electronic communications and other information belonging to mobile device users and are subject to the Federal Wiretap Act.

50. Upon information and belief, Defendants violated and continue to violate the Federal Wiretap Act through intercepting, endeavoring to intercept, or procuring other persons to intercept or endeavor to intercept the personal electronic communications and other information belonging to Plaintiff and members of the Class, including, but not limited to: (a) the content of text messages; (b) the content of online searches; (c) the URLs of the websites visited; and (d) the location of the mobile device users.

51. The Federal Wiretap Act further provides that:

> [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter . . . may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.
>
> In an action under this section, appropriate relief includes—(1) such preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c) and punitive damages in appropriate cases; and (3) a reasonable attorney's fee and other litigation costs reasonably incurred.
>
> [T]he court may assess as damages whichever is the greater of—(A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

18 U.S.C. §2520.

52. The Federal Wiretap Act establishes that the Carrier IQ rootkit software, in its present form, is not in compliance with federal law. By itself, the access, interception, and/or

collection of personal electronic communications and information, is unlawful and is an invasion or injury to the legally protected privacy interests of Plaintiff and Class members. That compromise to the privacy, confidentiality, and integrity of personal electronic communications and information belonging to the Plaintiff and the Class is actionable under the Federal Wiretap Act.

## CLASS ACTION ALLEGATIONS

53. This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs bring this action against Defendants both in their individual capacity, and in their representative capacity as members of the Class, on behalf of all persons in the United States whose personal electronic communications and information are or were unlawfully intercepted or collected by HTC, Samsung, their affiliates, or subsidiaries through the use of Carrier IQ software preinstalled on their Android smartphone devices. The Class consists of those persons who were or are owners of HTC and Samsung Android smartphone devices; subject to any exclusions set forth below.

54. Excluded from the Class are Defendants, including any entity in which Defendants have a controlling interest, or which is a parent or subsidiary of, or which is controlled by, any Defendant, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, or assigns of any Defendant.

55. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery. Plaintiffs believe, however, that there are millions of members of the proposed Class, including both current and past Samsung and HTC Android smartphone users whose personal electronic communications and information were unlawfully accessed, intercepted, collected and/or used by the Defendants.

56. Common questions of law and fact exist as to all Class members and predominate over any questions which affect only individual Class members. These common questions of law and fact include:

(a) Whether Defendants have or continue to access, intercept, and/or collect the following personal electronic communications or information in violation of the Federal Wiretap Act: (i) the mobile users' location; (ii) the mobile users' telephone numbers dialed; (iii) telephone numbers of individuals calling the mobile users; (iv) the contents of text messages mobile users receive; (v) the contents of text messages mobile users send; (vi) the contents of emails mobile users receive; (vii) the contents of emails mobile users send; (viii) the URLs of the websites that mobile users visit; (ix) the contents of the mobile users' online search queries; (x) the names and/or contact information from mobile users' address books; and (xi) any other key stroke data;

(b) Whether Defendants transmit the personal electronic communications and information from mobile users phones to wireless carriers, or other third parties;

(c) Whether Defendants use the personal electronic communications or information in violation of the Federal Wiretap Act; and

(d) Whether Plaintiff and the Class have sustained damages, and, if so, what is the proper measure of damages.

57. Plaintiffs' claims are typical of the claims of the Class they seek to represent in that Plaintiffs and each Class member sustained, and continue to sustain, damages arising from Defendant's wrongdoing. Plaintiffs' damages, as well as the damages of each Class member, were proximately caused by the Defendants' wrongful conduct as alleged herein and were otherwise foreseeable.

58. Plaintiffs will fairly and adequately protect the interests of those Class members they seek to represent and have no interests that are antagonistic to the interests of any other Class member. Plaintiffs have retained counsel who have substantial experience and success in complex litigation, including the litigation of class actions and consumer protection claims, and privacy protection claims in the class action context.

59. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class members is

impracticable. Furthermore, because the damages suffered, and continued to be suffered, by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

60. In addition, the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

**COUNT I**
**Violation of the Federal Wiretap Act**

61. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

62. At all relevant times, Defendants were "communication common carriers" as those terms are used in the Federal Wiretap Act.[9]

63. At all relevant times, Plaintiffs and the members of the Class were persons entitled to the protection of the Federal Wiretap Act as Mobile Device users and parties to electronic communications.

64. Upon information and belief, Defendants have and continue to intentionally use, intercept, endeavor to use, endeavor to intercept, or procure any other person to intercept or endeavor to intercept the substance of the personal electronic communications belonging to Plaintiff and members of the Class.

---

[9] *See* 18 U.S.C. § 2510; 47 U.S.C. § 153.

65. As a proximate result of Defendants' improper interception and/or collection of the personal electronic communications and information, the Class has suffered a legally cognizable loss or injury.

66. The losses sustained by the Class are directly attributable to Defendants' wrongful conduct and were entirely foreseeable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests the following relief, on behalf of herself and the Class:

A. Certification of this action as a class action, appointment of Plaintiff as a Class representative and the undersigned counsel as Class counsel;

B. An order declaring the actions complained of herein to be in violation of the statutory law set forth above, including a preliminary injunction enjoining Defendant from further acts in violation of the Federal Wiretap Act, pending the outcome of this action;

C. An order enjoining and restraining Defendant from any further acts in violation of the Federal Wiretap Act set forth above;

D. An award of statutory and compensatory damages in an amount deemed appropriate by the trier of fact against Defendants;

E. An award of prejudgment and post-judgment interest;

F. An award of costs, including, but not limited to, discretionary costs, attorneys' fees and expenses incurred in prosecuting this case; and

G. Any other and further relief to which Plaintiff and the Class may be entitled at law or in equity that this Court deems just and proper.

**JURY DEMAND**

Plaintiff and the Class demand a trial by jury on all issues so triable.

DATED: January 19, 2012

STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP

ALLAN STEYER
GABRIEL D. ZELDIN
One California Street, Third Floor
San Francisco, CA 94111
Telephone: 415-743-2808
415-421-2234 (fax)
asteyer@steyerlaw.com

GOLDFARB BRANHAM LLP
HAMILTON LINDLEY
2501 N. Harwood, Ste. 1801
Dallas, TX 75201
Telephone: 214/583-2233
214-583-2234 (fax)

*Attorneys for Plaintiffs*